Leigh A. Parker (170565)
lparker@weisslawllp.com
**WEISSLAW LLP**
1516 South Bundy Drive, Suite 309
Los Angeles, CA 90025
Telephone: 310/208-2800
Facsimile:  310/209-2348

*Attorneys for Plaintiff*
*and the Proposed Class*

[Additional counsel appear on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| STEPHEN BUSHANSKY, On Behalf of Himself and All Others Similarly Situated , <br><br> Plaintiff, <br><br> vs. <br><br> QLOGIC CORPORATION, JEAN HU, JOHN T. DICKSON, BALAKRISHNAN S. IYER, CHRISTINE KING, D. SCOTT MERCER, JAY A. ROSSITER, GEORGE D. WELLS, and WILLIAM M. ZEITLER, <br><br> Defendants. | Case No. <br><br><br> <u>CLASS ACTION</u> <br> **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

Plaintiff Stephen Bushansky ("Plaintiff"), by and through his undersigned counsel, for his complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This is a class action brought by Plaintiff on behalf of himself and the public stockholders of QLogic Corporation ("QLogic" or the "Company") against QLogic and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of §§ 14(d)(4), 14(e) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), and U.S. Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14d-9") and to enjoin the proposed transaction, pursuant to which QLogic will be acquired by Cavium, Inc. ("Cavium" or "Parent") through Parent's wholly owned subsidiary Quasar Acquisition Corp. ("Merger Sub") (the "Proposed Transaction").

2.      On June 15, 2016, QLogic and Cavium issued a joint press release announcing entry into an Agreement and Plan of Merger dated June 15, 2016 (the "Merger Agreement") to sell QLogic to Cavium for approximately $15.50 per share, comprised of $11.00 per share in cash and 0.098 of a share of Cavium common stock for each share of QLogic common stock, through an exchange offer (the "Offer Price").  The Proposed Transaction values QLogic at approximately $1.36 billion in equity value, inclusive of approximately $355 million of cash on QLogic's balance

sheet.  Cavium commenced the tender offer for the Company's shares on July 13, 2016.  The tender offer is set to expire on August 9, 2016.

3.     The Proposed Transaction is the result of an unfair process and provides the Company's stockholders with inadequate consideration.  As further described below, both the value to QLogic stockholders contemplated in the Proposed Transaction and the process by which defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public stockholders of the Company.

4.     Furthermore, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (i) a "no-solicitation" clause that prevents the Company from soliciting, and subject to minimal exceptions, from providing non-public information to potential alternate bidders; (ii) an "information rights" provision that requires the Company to promptly advise Cavium of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (iii) "matching rights" that allow Cavium four (4) business days to match any superior offer; and (iv) a provision requiring QLogic to pay a termination fee of $47.8 million if the Company decides to pursue a competing offer.  The collective effect of these provisions is to chill any potential post-deal market check.

5.     Additionally, QLogic insiders stand to gain handsomely from the Proposed Transaction.  Motivated by the lucrative incentives of substantial payments upon closing, the Board voted unanimously to approve the Proposed Transaction.

6.     Finally, compounding the unfairness of the Proposed Transaction, on July 13, 2016, QLogic filed a Recommendation Statement on Schedule 14D-9 (the "Recommendation Statement") with the SEC.  The Recommendation Statement, which recommends that QLogic stockholders tender their shares in support of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) QLogic's management's projections, utilized by Qatalyst Partners LP ("Qatalyst") in its financial analyses; (ii) the valuation analyses prepared by Qatalyst in connection with the rendering of its fairness opinion; and (iii) material information concerning the sale process leading up to the Proposed Transaction.  The failure to adequately disclose such material information constitutes a violation of §§ 14(d)(4), 14(e) and 20(a) of the Exchange Act as stockholders need such information in order to make a fully-informed decision regarding tendering their shares in connection with the Proposed Transaction.

7.     In short, the Proposed Transaction is designed to unlawfully divest QLogic's public stockholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company stockholders.  To remedy defendants' Exchange Act violations, Plaintiff seeks to

enjoin the Proposed Transaction or to rescind the Proposed Transaction in the event of consummation unless and until such problems are remedied.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under §§ 14(d), 14(e) and 20(a) of the Exchange Act, 15 U.S.C. § 78aa.  The Court has subject matter jurisdiction pursuant to § 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

9.     The Court has personal jurisdiction over all of the defendants because each is either a corporation that conducts business in and maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. §78aa, as well as pursuant to 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) QLogic maintains its principal place of business in this District and each of the Individual Defendants, and Company officers or directors, either resides in this District or has extensive contacts within this District; (iii) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (iv)  most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in

this District; and (v) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## **THE PARTIES**

11.     Plaintiff Stephen Bushansky is, and has been at all times relevant hereto, a continuous stockholder of QLogic.

12.     Defendant QLogic is a corporation organized and existing under the laws of Delaware, with its principal offices located at 26650 Aliso Viejo Parkway, Aliso Viejo, California 92656.  QLogic is a global leader and technology innovator in high performance server and storage networking connectivity products. Leading original equipment manufacturers ("OEMs") and channel partners worldwide rely on QLogic for their server and storage networking solutions. QLogic's common stock is traded on the Nasdaq under the ticker symbol "QLGC."

13.     Defendant Jean Hu ("Hu") has been the Company's acting Chief Executive Officer since August 2015.  Hu also has been the Company's Chief Financial Officer ("CFO") and a Senior Vice President since April 2011.

14.     Defendant John T. Dickson ("Dickson") has been a member of the Board since June 2014.  Dickson is the Company's Lead director and is a member of the Audit Committee and the Compensation Committee.

15.     Defendant Balakrishnan S. Iyer ("Iyer") has been a member of the Board since June 2003.   Iyer is Chair of the Audit Committee and a member of the Compensation Committee.

16.     Defendant Christine King ("King") has been a member of the Board since April 2013, and has served as Executive Chairman and Chairman of the Board since August 2015.

17.     Defendant D. Scott Mercer ("Mercer") has been a member of the Board since September 2010.   Mercer is Chair of the Nominating and Governance Committee and is a member of the Audit Committee.

18.     Defendant Jay A. Rossiter ("Rossiter") has been a member of the Board since May 2015.  Rossiter is a member of the Compensation Committee.

19.     Defendant George D. Wells ("Wells") has been a member of the Board since February 1994.  Wells is a member of the Audit Committee and the Nominating and Governance Committee.

20.     Defendant William M. Zeitler ("Zeitler") has been a member of the Board since September 2010.  Zeitler is Chair of the Compensation Committee and is a member of the Nominating and Governance Committee.

21.     Defendants Hu, Dickson, Iyer, King, Mercer, Rossiter, Wells and Zeitler are collectively referred to herein as the "Board" or the "Individual Defendants."

///

///

## OTHER RELEVANT ENTITIES AND PERSONS

22.   Cavium is a leading provider of highly integrated semiconductor products that enable intelligent processing in enterprise, data center, cloud, wired and wireless service provider applications.  Cavium is a corporation organized and existing under the laws of Delaware, with principal offices located in San Jose, California and with design team locations in California, Massachusetts, India, and China.  Cavium's common stock is traded on Nasdaq under the ticker symbol "CAVM."

23.   Merger Sub is a Delaware corporation and wholly-owned subsidiary of Cavium, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

24.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities that own QLogic common stock (the "Class").  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

25.   Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

26.   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands

of members in the Class.  As of July 8, 2016, there were approximately 83,898,078 shares of Company common stock issued and outstanding.  All members of the Class may be identified from records maintained by QLogic or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

27.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, among *inter alia*:

(a)     Whether defendants have violated § 14(d)(4) of the Exchange Act;

(b)     Whether defendants have violated § 14(e) of the Exchange Act;

(c)     Whether the Individual Defendants have violated § 20(a) of the Exchange Act; and

(d)     Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

28.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.  Plaintiff has retained competent counsel experienced in litigation of this nature.

29.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Company Background and Strong Financial Outlook

31.     QLogic designs and supplies high performance server and storage networking connectivity products that provide, enhance and manage computer data communication.   These products facilitate the rapid transfer of data and enable efficient resource sharing between servers, networks and storage. Its products are used in enterprise, managed service provider and cloud service provider data centers, along with other environments dependent on high performance, reliable data networking.

32.     QLogic's recent financial results underscore its promising prospects following disappointing financial results in prior quarters.   On July 30, 2015, the Company reported its financial results for the first quarter ended June 28, 2015.   Net revenue for the quarter was $113.4 million, compared to net revenue of $119.4 million year over year.   Net income on a GAAP basis for the quarter was $2.6 million, or $0.03 per diluted share, compared to $6.0 million, or $0.07 per diluted share year over year.   Commenting on the disappointing financial results, former QLogic President and CEO Prasad Rampalli ("Rampalli") stated:

We are disappointed with our first quarter financial performance. Our first quarter results were adversely impacted by lower than expected demand due to weakness in our traditional enterprise server and storage markets, and operational issues including an inventory build-up primarily at a major OEM customer that was not identified on a timely basis. We have taken actions to address these execution areas where we fell short and also plan to take actions over the next few months to reduce our operating costs by streamlining our business and prioritizing our investments. We remain committed to our strategy and will continue to focus on our core and expansion markets to deliver long-term growth and enhance shareholder value.

33.    Less than a month after reporting its first quarter financial results, on August 21, 2015 the Company issued a press release announcing changes to its leadership.  Rampalli resigned as President and CEO, and was replaced as interim CEO by defendant Hu.  Defendant King was also named Executive Chairman.  The press release stated that defendants Hu and King would "work together in reviewing the company's business opportunities and leading the company forward."

34.    On October 22, 2015, the Company reported its financial results for the second quarter ended September 27, 2015.  For the quarter, QLogic reported net revenue of $103.4 million, compared to $127.5 million year over year.  Net income on a GAAP basis was $2.2 million, or $0.03 per diluted share, compared to $11.0

million, or $0.12 per diluted share year over year.  Commenting on the financial results, defendant Hu stated:

> During the second quarter, we prioritized our investment programs to renew focus on our core Fibre Channel and Ethernet product portfolios. We have launched new Fibre Channel products and achieved significant design wins with our 25/50/100Gb differentiated Ethernet solutions. We believe we are making important progress on the business and operational fronts and remain sharply focused on improving our financial performance in the second half of fiscal 2016 and beyond.

35.    On January 28, 2016, QLogic issued a press release announcing substantially improved financial results for the third quarter ended December 27, 2015.   For the third quarter, QLogic reported net revenue of $122.7 million, compared to $140.2 million year over year.  Net income on a GAAP basis was $23.4 million, or $0.28 per diluted share, compared to $22.4 million, or $0.25 per diluted share year over year. Commenting on these favorable results, defendant Hu remarked:

> I am very pleased with our financial performance and execution during the third quarter. We delivered both revenue and non-GAAP earnings per diluted share *above the high end of our guidance range*. We believe that as we execute on our strategy to focus on providing differentiated solutions for both Fibre Channel and Ethernet connectivity platforms

across enterprise and cloud data centers, we will be **well positioned to deliver earnings growth and enhanced shareholder value**.

Emphasis added.

36.     On May 5, 2016, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended April 3, 2016.  For the fourth quarter, QLogic reported net revenue of $119.4 million compared to $133.0 million year over year.  Net income on a GAAP basis for the fourth quarter of fiscal 2016 was $18.2 million, or $0.22 per diluted share, compared to $11.1 million, or $0.13 per diluted share year over year.  Net revenue for fiscal year 2016 was $458.9 million, compared to $520.2 million in fiscal year 2015.  Net income on a GAAP basis for fiscal year 2016 was $46.5 million, or $0.54 per diluted share, compared to $50.6 million, or $0.57 per diluted share, in fiscal year 2015.  Commenting on the financial results, defendant Hu stated:

I am **very pleased with our financial performance** during the fourth quarter and our strong finish for the second half of fiscal 2016. For the second consecutive quarter, we delivered **both revenue and non-GAAP earnings per diluted share above the high end of our guidance range**. Looking ahead, we will continue to focus on improving operational execution to deliver intelligent high performance connectivity solutions across both enterprise and cloud data centers.

Emphasis added.

**The Background of the Proposed Transaction**

37.    On August 19 and August 20, 2015, the Board held a regularly scheduled meeting, at which members of the Company's senior management were in attendance.  At this meeting, in connection with the resignation of the Company's prior President and CEO, the Board appointed defendant King as the Company's Executive Chairman and appointed defendant Hu as the Company's acting CEO, in addition to her role as the Company's CFO.  The Company's management reviewed for the Board the Company's business plan and its expected financial results for the first half of fiscal year 2016, which were below management's internal and analysts' expectations.  After discussion of the Company's long-term prospects, the Board directed defendants King and Hu to: (i) as a matter of highest priority, develop a strategic plan to improve the Company's operating performance and financial results with a focus on the Company's core business, (ii) perform a strategic evaluation of the Company's business, and (iii) consider strategic options including acquisitions and divestitures and a sale of the Company (including discussing available options with a financial advisor).

38.    Thereafter, between August 2015 and May 2016 a total of 23 potentially interested parties had been contacted (or had contacted the Company), including those who approached Qatalyst[1] after April 8, 2016 press reports regarding the

---

[1]   At a November 12, 2015 Board meeting, the Board authorized the Company's management to retain Qatalyst as its financial advisor.  Defendants King and Hu

Company and its potential sale.  Of the 23 potentially interested parties, 19 were strategic bidders and the other four were financial sponsors.

39.    On February 16, 2016, members of the Company's senior management team, including defendants King and Hu, and Qatalyst met with members of Party A's senior management team and Party A's financial advisor, to discuss a potential strategic transaction between Party A and the Company.   Party A presented a preliminary proposal to acquire the Company for cash and stock.  Based on the closing price of Party A's common stock on February 12, 2016 and the number of fully-diluted equity securities outstanding for each of Party A and the Company as of that date, Party A's proposal implied a total value of approximately $12.83 per share of the Company's common stock, consisting of approximately $5.79 in cash and approximately $7.04 in stock per share.

40.    Thereafter, on February 25, 2016, the Board held a special meeting with the Board instructing management and Qatalyst to provide additional due diligence information to Party A along with a counter-proposal of approximately $16.75 in cash and stock, with the exact cash per share and exchange ratio in the counter-proposal within the parameters provided by the Board to be determined by defendant King and Qatalyst when delivered to Party A.

_____

contacted Qatalyst in December 2015, although QLogic did not execute a formal engagement letter with Qatalyst until March 17, 2016.

41.    On March 7, 2016, members of the Company's senior management team, including defendants King and Hu, and Qatalyst met with members of Party A's senior management team and Party A's financial advisor, to conduct additional due diligence regarding a potential strategic transaction between Party A and the Company.   At this meeting, the Company reviewed its financial projections along with additional due diligence information.   Also at this meeting, representatives of Qatalyst provided Party A with a counter-proposal of approximately $16.75 per share (consisting of $6.00 per share in cash plus a fraction of a share of Party A common stock valued at $10.75 based on the closing stock price of Party A's stock on March 4, 2016).

42.    On March 10, 2016, representatives of Qatalyst contacted Party A's financial advisor to discuss the Company's March 7, 2016 counter-proposal, and Party A's financial advisor reiterated that Party A was considering whether it would be willing to continue to move forward with discussions regarding a strategic transaction with the Company.

43.    On March 14, 2016, the CEO of Party A emailed defendant King and indicated that Party A would need additional time to consider the Company's counter-proposal, as well as to review the additional due diligence information the Company had provided, and reiterated that Party A was considering whether it would be willing to continue to move forward with a strategic transaction with the Company.

44.    On March 19, 2016, the CEO of Party A called defendant King to reject the Company's March 7, 2016 counter-proposal and inform her that Party A had determined not to move forward with a strategic transaction with the Company as Party A was ultimately unable to justify a strategic combination of the two companies.

45.    A few months later, on May 23, 2016, Party C submitted a written indicative offer of $14.00 per share in cash, requested four to six weeks of exclusivity and noted that the transaction closing would not be subject to a financing condition. The Company's closing stock price on May 20, 2016 was $13.30 per share.

46.    The next day, Cavium's CEO Syed Ali ("Ali") called defendant King to preview Cavium's indication of interest, including a verbal summary of the high-level terms.  Later that day, Cavium submitted an indication of interest to acquire the Company's outstanding common stock for $15.00 per share, consisting of $10.50 in cash and $4.50 in stock (based on a fixed exchange ratio at signing), conditioned on exclusivity through the announcement date of a transaction and noting that the transaction closing would not be subject to a financing condition.  The indication of interest specified that the proposal would expire at 5:00 pm Pacific Time on May 27, 2016.  Also on May 24, 2016, Ali asked defendant King whether she would be open to joining Cavium's board of directors after the closing of a potential transaction. Defendant King replied that she would be open to joining Cavium's board of directors, subject to scheduling conflicts with her other board responsibilities.

Despite Cavium dangling the lucrative board position to defendant King and the conflict of interest presented by this offer, the Board took no steps to remove defendant King from the negotiations with Cavium or set up a committee of independent directors to lead negotiations with Cavium.

47.     On May 26, 2016, the Board held a regularly scheduled meeting, with defendant King reviewing with the Board a situational assessment, the Company's business outlook, strategic opportunities and a stand-alone operating model and discussing possible acquisition opportunities.  Qatalyst updated the Board on the status of discussions with various potential bidders, noting that a total of 23 potentially interested parties had been contacted (or had contacted the Company), including those who approached Qatalyst after April 8 press reports regarding the Company and its potential sale.  Of the 23 potentially interested parties, 19 were strategic bidders and the other four were financial sponsors, and as of that date, only two remained in discussions with the Company, one of which was a strategic buyer and the other a financial sponsor.  Members of the Board then disclosed to the Board certain limited partner investor relationships that they had with funds set up by Party C.  The Board further discussed and considered the proposals received from Cavium and Party C, and representatives of Qatalyst reviewed with the Board certain illustrative transaction statistics, certain factors, among others, that the Board could consider in comparing an all-cash offer to a cash-and-stock offer, and illustrative post-announcement share price scenarios for Cavium's stock and how that might

impact the merger consideration given the use of a fixed exchange ratio.  The Board discussed with Qatalyst the impact that the deal announcement might have on Cavium's stock price and therefore on the potential merger consideration. Representatives of Qatalyst then reviewed with the Board a presentation to assess the Company's stand-alone valuation as well as the potential value of a combination with Cavium.  The Board noted that Cavium had already conducted substantial business and legal due diligence whereas Party C expected to need four to six weeks to conduct due diligence. The Board also indicated that, given the extensive marketing effort that had been undertaken by the Company and Qatalyst, it was open to a relatively short exclusivity period if agreement on price could be reached.  The Board then directed defendant King to negotiate with Cavium to potentially increase the proposed consideration.

48.     Later on May 26, 2016, defendant King called Ali to negotiate the offer price and exclusivity period reflected in Cavium's May 24 indication of interest. Defendant King asked that Cavium raise its offer to between $16.00 and $16.50 per share.  Following a discussion, Ali indicated that he would discuss with Cavium's board of directors an offer price of $15.50 per share, after which Cavium's board of directors met telephonically and after a consideration of a number of factors agreed to the submission of a "best and final" offer of $15.50 per share, consisting of $11.00 in cash and $4.50 in stock per share.  Ali subsequently communicated to defendant King a "best and final" offer of $15.50 per share, consisting of $11.00 in cash and $4.50 in

stock per share (based on a fixed exchange ratio at signing), and an exclusivity period until June 23, 2016.   The Company's closing stock price on May 25, 2016 was $13.70.

49.     Later on May 26, 2016, the Board meeting reconvened and defendant King reported that Cavium was willing to increase the cash portion of its offer from $10.50 to $11.00 per share, for an aggregate pre-signing deal value of $15.50 per share, conditioned on an exclusivity period through June 23, 2016. Despite not seeking to extract a higher offer from Party C, the Board unanimously approved the Company entering into an exclusivity period with Cavium until June 23, 2016 and asked management to work with Cavium in completing due diligence and negotiating a merger agreement.

50.     Following the May 26, 2016 Board meeting, Qatalyst provided feedback to a representative of Party C informing that representative of the exclusivity arrangement being entered into with another party.

51.     On May 28, 2016, the Company and Cavium entered into an exclusivity agreement dated as of May 27, 2016, providing for exclusivity through June 23, 2016 in connection with the negotiation of a potential strategic transaction.

52.     On June 15, 2016, the Board held a special meeting and determined that (i) the offer and the merger are fair to, and in the best interests of, the Company and its stockholders; (ii) authorized, approved, adopted and declared advisable the Merger Agreement, the offer and the merger; (iii) resolved that the merger be effected as soon

as practicable following consummation of the offer without a vote of the Company's stockholders pursuant to § 251(h) of the DGCL; and (iv) subject to the terms of the Merger Agreement, resolved and recommended that the stockholders of the Company accept the offer and tender their shares of Company common stock pursuant to the offer.

53.    The next day, the Company and Cavium announced entry into the Merger Agreement.

54.    The Recommendation Statement sets forth that none of the parties who executed confidentiality agreements with the Company in connection with a potential transaction is subject to any contractual restriction with the Company that prevents that party from making a potential superior proposal or requesting a waiver from the Company for the purpose of submitting a potential superior proposal.    The Recommendation Statement fails to disclose, however, whether any of the parties who executed confidentiality agreements that contain standstill provisions have requested a waiver from the Company, and if so, whether these parties have been released from the standstill provisions in order to make a topping bid for the Company.

**The Proposed Transaction is Inadequate**

55.    On June 15, 2016, the Company and Cavium issued a joint press release announcing the Proposed Transaction.  That press release stated, in relevant part:

San Jose and Aliso Viejo, CA, June 15, 2016 – Cavium, Inc. (NASDAQ:CAVM) ("Cavium"), a leading provider of semiconductor products that enable intelligent processing for enterprise, data center, cloud, wired and wireless networking, and QLogic Corp. (NASDAQ:QLGC) ("QLogic"), a leading supplier of high performance networking infrastructure solutions, today announced that they have entered into a definitive agreement for Cavium to acquire all of the outstanding QLogic common stock for approximately $15.50 per share, comprised of $11.00 per share in cash and 0.098 of a share of Cavium common stock for each share of QLogic common stock (valued at approximately $4.50 based on the volume weighted average Cavium trading price for the three trading days beginning June 10, 2016), through an exchange offer. The transaction values QLogic at approximately $1.36 billion in equity value, inclusive of approximately $355 million of cash on QLogic's balance sheet, and has been unanimously approved by the boards of directors of both companies.

* * *

 "Today's acquisition of QLogic is highly complementary and strategic to Cavium and it creates a diversified pure-play infrastructure semiconductor leader," stated Syed Ali, President and Chief Executive

Officer of Cavium. "QLogic's industry leading products extend our market position in data center, cloud and storage markets, and further diversifies our revenue and customer base. In addition to the compelling strategic benefits, the manufacturing, sales and operating synergies will create significant value for our shareholders."

* * *

The transaction will be funded with a combination of $220 million balance sheet cash, $750 million of committed financing, which includes $650 million of term loan and $100 million of short-term bridge debt, and $400 million in new Cavium equity.

Under the terms of the definitive merger agreement, a wholly-owned subsidiary of Cavium will commence an exchange offer to acquire all of the outstanding shares of QLogic common stock for $11.00 in cash and 0.098 of a share of Cavium common stock (approximately $4.50 per share based on the volume weighted average Cavium trading price for the three trading days beginning June 10, 2016) for each share of QLogic common stock tendered in the exchange offer. Upon satisfaction of the conditions to the exchange offer, and after the shares tendered in the exchange offer are accepted for payment, the agreement provides for the

parties to effect, as promptly as practicable, a merger, which would not require a vote of QLogic's stockholders, and which would result in each share of QLogic common stock not tendered in the exchange offer being converted into the right to receive $11.00 in cash and 0.098 of a share of Cavium common stock. The transaction is expected to close in the third quarter of calendar year 2016 pending customary closing conditions, including the tender into the exchange offer by QLogic stockholders of shares representing at least a majority of the outstanding shares of QLogic common stock, and the receipt of relevant regulatory approvals, including the expiration or termination of the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act.

J.P. Morgan acted as exclusive financial adviser and provided a financing commitment to Cavium; Skadden, Arps, Slate, Meagher & Flom LLP acted as Cavium's legal counsel. Qatalyst Partners acted as exclusive financial adviser to QLogic and O'Melveny & Myers LLP acted as QLogic's legal counsel.

56.   The Offer Price fails recognize the value of QLogic to Cavium.  In the joint press release, Ali, President and CEO of Cavium commented on the benefits Cavium will enjoy as a result of the Proposed Transaction:

Today's acquisition of QLogic is highly complementary and strategic to Cavium and it creates a diversified pure-play infrastructure

semiconductor leader. QLogic's industry leading products extend our market position in data center, cloud and storage markets, and further diversifies our revenue and customer base. In addition to the compelling strategic benefits, the manufacturing, sales and operating synergies will create significant value for our shareholders.

57.    Moreover, as recently as June 17, 2016, analyst James Kelleher at Argus Research Corp. maintained a $16.00 price target for QLogic originally set on May 11, 2016, which is $0.50 above the $15.50 Offer Price.

58.    A June 16, 2016 article published by *Seeking Alpha* examined the benefits Cavium will enjoy as a result of the Proposed Transaction.  The article noted that Cavium is "doubling the size of its operations," and the Proposed Transaction will "bring profits, large synergies and improve the diversification of the business." The article elaborated on the benefits Cavium stands to enjoy:

It is important to realize that QLogic is a large business, anticipated to add $400-$410 million in annual revenues. This means that ***Cavium's sales will double overnight***.

* * *

***The real kicker are the synergies*** which are typically high in semiconductor deals as these companies are very R&D intensive. Cavium can avoid duplicated listing costs, eliminate a lot of overlapping R&D and improve both the efficiency and effectiveness of the sales

team. The company sees *costs savings of at least $45 million per annum*, suggesting that the deal *could boost operating earnings by $85 million per year*. That looks like a pretty decent earnings contribution, given that the enterprise valuation paid for QLogic stands at $1 billion.

Emphasis added.

### The Board Impermissibly Locked Up the Proposed Transaction

59.     The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving QLogic's public stockholders with no meaningful change of control premium for their shares.  When viewed collectively, these provisions, which are detailed below, further the interests of Cavium, certain Individual Defendants and other QLogic insiders to the detriment of QLogic's public stockholders and cannot represent a justified, appropriate or proportionate response to any threat posed by a potential third party bidder.

60.     The Individual Defendants have agreed to the following unreasonable deal protection devices:

•       A "no-solicitation" clause that prevents QLogic from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, § 7.3(a));

•       An "information rights" provision that requires the Company to

promptly advise Cavium of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, § 7.3(c));

- A "matching rights" provision that allows Cavium four (4) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation (Merger Agreement, § 7.3(e)); and

- A termination fee of $47.8 million payable by the Company to Cavium if QLogic decides to pursue a competing bid (Merger Agreement, § 9.2).

61.    The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

62.    The reason behind these deal protection devices is clear: the absence of a meaningful premium for stockholders creates the very real potential that a third party bidder will attempt to usurp Cavium and submit a higher bid for QLogic.  The possibility that a third-party bidder will emerge motivated Cavium to "lock-up" the

Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Cavium could purchase the Company for less than would otherwise be possible.

63.    Taken as a whole, the foregoing deal protection devices foreclose the possibility that a third-party "white knight" could step forward to provide QLogic stockholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

**Insiders' Interests in the Proposed Transaction**

64.    Cavium and QLogic insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of QLogic.

65.    Notably, defendant King has been offered a seat on the combined company's board of directors, a lucrative position that was dangled by Cavium during the sale process.

66.    While the Company's public stockholders are receiving inadequate consideration for their valuable QLogic holdings, its named executive officers will achieve a substantial payday.  If they are terminated in connection with the Proposed Transaction, QLogic's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation.    According to the

Recommendation Statement, defendant Hu *alone* stands to receive over $7 million in severance benefits if she is not retained after consummation of the Proposed Transaction, as detailed in the chart below:

| Named Executive Officers(1) | Cash(2) | Equity(3) | Perquisites / Benefits(4) | Total |
|---|---|---|---|---|
| Jean Hu | $ 2,257,800 | $ 4,731,972 | $ 14,934 | $ 7,004,706 |
| Christine King | $ 1,684,350 | $ 2,822,584 | $ 1,551 | $ 4,508,485 |
| Anthony E. Carrozza | $ 781,000 | $ 2,039,512 | $ 19,489 | $ 2,840,001 |
| Roger J. Klein | $ 671,500 | $ 1,533,880 | $ 13,825 | $ 2,219,205 |

67.    Moreover, QLogic's directors and executive officers will receive substantial cash consideration for their significant holdings of QLogic stock, as well as liquidity for their QLogic stock upon receiving Cavium common stock in the Proposed Transaction.   The following table summarizes (i) the holdings of the Company's directors and executive officers; (ii) the cash consideration to be received for their shares; (iii) the number of Cavium shares to be received in exchange for QLogic shares; and (iv) the total value of the shares:

| Name | Number of Shares(1) | Cash Consideration to Be Received for Shares | Number of Shares of Cavium Common Stock to Be Received for Shares | Total Value of Shares(2) |
|---|---|---|---|---|
| **Executive Officers(3)** | | | | |
| Anthony E. Carrozza | 10,838 | $ 119,218 | 1,062 | $ 161,412 |
| Jean Hu | 63,267 | $ 695,937 | 6,200 | $ 942,245 |
| Christine King(4) | 25,719 | $ 282,909 | 2,520 | $ 383,037 |
| Roger J. Klein | 15,810 | $ 173,910 | 1,549 | $ 235,461 |
| **Directors** | | | | |
| John T. Dickson | 20,698 | $ 227,678 | 2,028 | $ 308,258 |
| Balakrishnan S. Iyer | 44,780 | $ 492,580 | 4,388 | $ 666,915 |
| D. Scott Mercer | 41,780 | $ 459,580 | 4,094 | $ 622,236 |
| Jay A. Rossiter | 2,682 | $ 29,502 | 262 | $ 39,943 |
| George D. Wells | 52,408 | $ 576,488 | 5,135 | $ 780,520 |
| William M. Zeitler | 51,780 | $ 569,580 | 5,074 | $ 771,167 |

68.    Therefore, while QLogic's public stockholders will lose control of the Company for an unfair price, certain Company insiders will substantially benefit if the Proposed Transaction is consummated.

**The Recommendation Statement Contains Numerous Material Misstatements or Omissions**

69.    Compounding the unfair sale process and the inadequacy of the Offer Price, the defendants also filed the materially incomplete and misleading Recommendation Statement with the SEC and disseminated it to QLogic's stockholders.   The Recommendation Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to tender their shares in support of the Proposed Transaction.

70.    Specifically, as set forth below, the Recommendation Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) QLogic's financial projections, relied upon by Qatalyst; (ii) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinion" provided by QLogic's financial advisor Qatalyst; and (iii) the background of the Proposed Transaction.   Accordingly, QLogic stockholders are being asked to tender their shares in support of the Proposed Transaction without all material information at their disposal.

///

///

*Material Omissions Concerning QLogic's Financial Projections*

71.    The Recommendation Statement fails to disclose material information relating to the financial projections of QLogic that were relied upon by Qatalyst in conducting its financial valuation analyses.

72.    With respect to QLogic, the Recommendation Statement fails to disclose the financial forecasts provided by QLogic management and relied upon by Qatalyst for purposes of its analysis, for fiscal years 2017-2022, for the following items: (i) D&A; (ii) Taxes payable in cash; (iii) Capital expenditures; (iv) investment working capital; and (v) Any other adjustments to unlevered free cash flow.

73.    The failure to disclose the financial forecast information set forth above, renders the following information from the Recommendation Statement false and/or misleading:

(a)    from pages 39-40 of the Recommendation Statement:

**Financial Forecasts of the Company**

The following is a summary of the Company Projections:

*($MM, except percentages and per share amounts)*

| | Fiscal Year(1) | | | | | |
|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Revenue | $ 480 | $ 494 | $ 510 | $ 528 | $ 546 | $ 569 |
| Revenue Growth % | 5% | 3% | 3% | 4% | 3% | 4% |
| Gross Profit(2) | $ 293 | $ 301 | $ 319 | $ 336 | $ 344 | $ 356 |
| Gross Profit Margin %(2) | 61% | 61% | 63% | 64% | 63% | 63% |
| Operating Income(3) | $ 97 | $ 102 | $ 120 | $ 135 | $ 140 | $ 148 |
| Operating Income Margin %(3) | 20% | 21% | 24% | 26% | 26% | 26% |
| Earnings Per Share(4) | $1.05 | $1.12 | $1.36 | $1.57 | $1.66 | $1.81 |
| Earnings Per Share Growth %(4) | 7% | 7% | 21% | 16% | 6% | 9% |

(1)    The Company's fiscal year end is the Sunday nearest March 31 (e.g., fiscal year 2017 will end on April 2, 2017).

(2)    Gross profit, as used in the Company Projections, is a non-GAAP financial measure and represents GAAP gross profit adjusted to exclude stock-based compensation, amortization of acquisition-related intangible assets and amortization of license fee.

(3)    Operating income, as used in the Company Projections, is a non-GAAP financial measure and represents GAAP operating income adjusted to exclude stock-based compensation, amortization of acquisition-related intangible assets, amortization of license fee and special charges.

(4)    Earnings per share, as used in the Company Projections, is a non-GAAP financial measure and represents GAAP earnings per share adjusted to exclude stock-based compensation, amortization of acquisition-related intangible assets, amortization of license fee, special charges and income tax adjustments. The Company derives non-GAAP earnings per share from non-GAAP net income using non-GAAP fully diluted share count.

The following is a summary of the projected unlevered free cash flow, which is derived from the Company Projections summarized in the table above:

*($MM)*

| | Fiscal Year(1) | | | | |
|---|---|---|---|---|---|
| | Q2-Q4 2017 | 2018 | 2019 | 2020 | 2021 |
| UFCF(2) | $ 73 | $101 | $113 | $126 | $128 |

(1) The Company's fiscal year end is the Sunday nearest March 31 (e.g., fiscal year 2017 will end on April 2, 2017).

(2) Unlevered free cash flow is a non-GAAP financial measure calculated by starting with operating income (as shown in the table above) and subtracting cash taxes paid, capital expenditures and investment in working capital and then adding back depreciation expense. Unlevered free cash flow excludes any projected stock repurchases.

74.    These material omissions of the best estimates of the Company's financial future misleads QLogic's stockholders by providing only selected information.  The omission needs to be remedied prior to the expiration of the tender offer in order to allow QLogic stockholders to make a fully informed decision on the Proposed Transaction.

///

- 33 -

*Material Omissions Concerning Qatalyst's Financial Analyses*

75.     The Recommendation Statement describes Qatalyst's fairness opinion and the various valuation analyses it performed in support of its opinion.  However, the description of Qatalyst's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses.  Without this information, as described below, QLogic's public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on Qatalyst's fairness opinion in determining whether to tender their shares in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total mix of information available to QLogic's stockholders.

76.     With respect to Qatalyst's *Illustrative Discounted Cash Flow Analysis* of QLogic, the Recommendation Statement fails to disclose: (i) the individual inputs and assumptions utilized by Qatalyst to derive the discount rate range of 10.0% - 11.5%; and (ii) the basis for selecting the range of fully-diluted enterprise value to next-twelve-months NOPAT multiples of 6.5x to 10.5x used to derive the terminal value of QLogic.

77.     Omission of these critical inputs and assumptions underlying the discounted cash flow analysis make the following Recommendation Statement information false and/or misleading:

    (a)     from page 33 of the Recommendation Statement:

***Illustrative Discounted Cash Flow Analysis***

Qatalyst Partners performed an illustrative discounted cash flow analysis (DCF), which is designed to imply a potential, present value per Share as of June 30, 2016 by:

adding:

- the implied net present value of the estimated future unlevered free cash flows of the Company, based on the Company Projections, for the second through fourth quarters of fiscal year 2017 through fiscal year 2021 (which implied present value was calculated using a range of discount rates of 10.0% to 11.5%, based on an estimated weighted average cost of capital);

- the implied net present value of a corresponding terminal value of the Company, calculated by multiplying the Company's estimated non-GAAP net operating profit after tax ("NOPAT") in fiscal year 2022, based on the Company Projections, by a range of fully-diluted enterprise value to next-twelve-months NOPAT multiples of 6.5x to 10.5x, and discounted to present value using the same range of discount rates used in the calculation of the implied net

present value of the estimated future unlevered free cash flows of the Company described above; and

• the estimated net cash of the Company as of June 30, 2016, as provided by the Company's management;

• applying a dilution factor of approximately 5.1% to reflect the dilution to current stockholders, assuming no buybacks, due to the effect of future issuance of equity awards through the end of fiscal year 2021, as projected by the Company's management; and

• dividing the resulting amount by the number of fully-diluted shares of the Company's common stock outstanding, adjusted for Company RSUs, Company PRSUs, and Company Stock Options outstanding (assuming the treasury stock method), as provided by the Company's management as of June 14, 2016.

Based on the calculations set forth above, this analysis implied a range of values for the Company common stock of approximately $14.08 to $18.07 per share. Qatalyst Partners noted that the implied value of the consideration to be received by holders of Company

common stock pursuant to the Merger Agreement was $15.53 per share, based on Cavium's closing stock price on June 14, 2016.

78.   The Recommendation Statement fails to disclose whether Qatalyst performed a Discounted Cash Flow Analysis of Cavium on a standalone basis, which would have been appropriate in light of the structure of the Proposed Transaction, which includes Cavium stock as a component of the Offer Price.

79.   With respect to Qatalyst's *Selected Companies Analysis*, the Recommendation Statement fails to disclose whether Qatalyst performed any type of benchmarking analysis for QLogic in relation to the selected public companies.  This information is material to stockholders because stockholders are entitled to observe whether QLogic is truly comparable to the companies selected by Qatalyst and assess the efficacy of Qatalyst's analysis for themselves.

80.   Omission of the benchmarking analysis make the following Recommendation Statement information false and/or misleading:

(a)   from pages 34-35 of the Recommendation Statement:

**Selected Companies Analysis**

Qatalyst Partners compared selected financial information and public market multiples for the Company with publicly available information and public market multiples for selected companies. The companies used in this comparison included those companies listed

below, which were selected because they were publicly traded companies in the Company's industry or closely-related industries, have similar financial performance, or have other relevant or similar characteristics.

| Selected Companies | NTM NOPAT Multiples | CY2017E P/E Multiples |
|---|---|---|
| Avago Technologies Ltd. | 14.6x | 12.1x |
| Brocade Communication Systems, Inc. | 9.2x | 9.1x |
| Cavium, Inc. | 29.0x | 22.6x |
| Inphi Corporation | 24.4x | 20.4x |
| Integrated Device Technology Inc. | 15.6x | 14.5x |
| Intel Corporation | 15.7x | 12.2x |
| Lattice Semiconductor Corp. | 10.4x | 9.7x |
| Marvell Technology Group | 15.0x | 24.9x |
| Mellanox Technologies, Ltd. | 13.5x | 11.7x |
| Microsemi Corporation | 13.3x | 8.7x |
| Seagate Technology PLC | 15.3x | 9.9x |
| Semtech Corporation | 17.5x | 15.5x |
| Western Digital Corporation | 13.4x | 8.3x |
| Xilinx, Inc. | 17.9x | 20.5x |

Based upon research analyst consensus estimates for the next twelve-month period ending March 31, 2017 and using the closing prices as of June 14, 2016 for shares of the selected companies, Qatalyst Partners calculated, among other things, the implied fully-diluted enterprise value divided by the estimated consensus NOPAT for the period ending March 31, 2017, for each of the selected companies (the "Market NOPAT Multiples"). Qatalyst Partners also calculated the implied fully-diluted enterprise value of the Company divided by the Company's estimated consensus NOPAT for the next twelve months at each date for the period between January 12, 2011 and June 14, 2016

(the "Company NOPAT Multiples"). Based on a review of the Market NOPAT Multiples for the selected companies and the Company NOPAT Multiples, Qatalyst Partners selected a representative range of 6.5x to 10.5x and applied this range to estimates of the Company's NOPAT for the twelve-month period ending March 31, 2017 based on each of the Company Projections and the street case of $86 million and $87 million, respectively. Based on the calculations set forth above, adding the net cash of the Company as of April 3, 2016, as provided by the Company's management, then dividing the resulting amount by the fully-diluted shares of the Company's common stock outstanding, adjusted for Company RSUs, Company PRSUs, and Company Stock Options outstanding (assuming the treasury stock method), as provided by the Company's management as of June 14, 2016, this analysis implied a range of values for the Company common stock of approximately $10.39 to $14.29 per share based on the Company's Projections and $10.47 to $14.41 per share based on the street case. Qatalyst Partners noted that the implied value of the consideration to be received by holders of Company common stock pursuant to the Merger Agreement was $15.53 per share, based on Cavium's closing stock price on June 14, 2016.

For each of the selected companies listed above, Qatalyst Partners also calculated, among other things, the price per share divided by the estimated earnings per share for calendar year 2017 for each of the selected companies, which is referred to as the "CY2017E P/E Multiple." Based on a review of the CY2017E P/E Multiples for the selected companies, Qatalyst Partners selected a representative range of 8.5x to 14.0x and applied this range to the Company's estimated calendar year 2017 earnings per share based on each of the Company Projections and the street case of $1.13 and $1.08, respectively. This analysis implied a range of values for the Company common stock of approximately $9.60 to $15.81 per share based on the Company Projections and $9.19 to $15.14 per share based on the street case. Qatalyst Partners noted that the implied value of the consideration to be received by holders of Company common stock pursuant to the Merger Agreement was $15.53 per share, based on Cavium's closing stock price on June 14, 2016.

No company included in the selected companies analysis is identical to the Company. In evaluating the selected companies, Qatalyst Partners made judgments and assumptions with regard to industry performance, general business, economic, market and financial conditions and other matters. Many of these matters are beyond the control of the Company,

such as the impact of competition on the business of the Company or the industry in general, industry growth and the absence of any material adverse change in the financial condition and prospects of the Company or the industry or in the financial markets in general, which could affect the public trading value of the companies. Mathematical analysis, such as determining the arithmetic mean, median, or the high or low, is not in itself a meaningful method of using selected company data.

81.    With respect to Qatalyst's *Selected Transactions Analysis*, the Recommendation Statement fails to disclose why Qatalyst applied NTM revenue multiples and NTM P/E multiples to QLogic's estimated NTM revenue and NTM earnings for the period ending March 31, 2017 based on the street case and not on QLogic's management forecasts.

82.    Omission of the rationale for not utilizing QLogic management's projections in this analysis make the following Recommendation Statement information false and/or misleading:

(a)    from pages 35-36 of the Recommendation Statement:

**Selected Transactions Analysis**

Qatalyst Partners compared selected public transactions involving companies providing semiconductors or systems to networking and

storage end markets that were announced between December 2013 and

November 2015.

| Announcement Date | Target | Acquirer | NTM Revenue Multiples | NTM P/E Multiples |
|---|---|---|---|---|
| November 24, 2015 | PMC-Sierra, Inc. | Microsemi Corporation | 4.2x | 18.6x |
| November 9, 2015 | Pericom Semiconductor Corporation | Diodes Inc. | 2.1x | 19.9x |
| September 30, 2015 | EZchip Semiconductor Ltd. | Mellanox Technologies, Ltd. | 4.8x | 16.2x |
| May 28, 2015 | Broadcom Corporation | Avago Technologies Ltd. | 3.8x | 19.0x |
| February 25, 2015 | Emulex Corporation | Avago Technologies Ltd. | 1.5x | 14.3x |
| December 16, 2013 | LSI Corporation | Avago Technologies Ltd. | 2.7x | 17.1x |

For each of the transactions listed above, Qatalyst Partners

reviewed, among other things, the implied fully-diluted enterprise value

of the target company as a multiple of analyst estimates of the next-

twelve-months' revenue of the target company (the "NTM Revenue

Multiple"). Based on this review, Qatalyst Partners selected a

representative range of 1.5x to 3.5x and applied it to the Company's

estimated next-twelve-months' revenue for the period ending March 31,

2017 based on the street case of $478 million. Based on the calculations

set forth above, adding the net cash of the Company as of April 3, 2016,

as provided by the Company's management, then dividing the resulting

amount by the fully-diluted shares of the Company's common stock

outstanding, adjusted for Company RSUs, Company PRSUs, and

Company Stock Options outstanding (assuming the treasury stock

method), as provided by the Company's management as of June 14,

2016, this analysis implied a range of values for the Company common stock of approximately $12.21 to $22.72 per share. Qatalyst Partners noted that the implied value of the consideration to be received by holders of Company common stock pursuant to the Merger Agreement was $15.53 per share, based on Cavium's closing stock price on June 14, 2016.

For each of the transactions listed above, Qatalyst Partners also reviewed the price per share paid for the target company as a multiple of analyst estimates of the next-twelve-months' earnings per share of the target company (the "NTM P/E Multiple"). Based on this review, Qatalyst Partners selected a representative range of 14.5x to 19.0x and applied it to the Company's estimated next-twelve-months' earnings for the period ending March 31, 2017 based on the street case of $1.05. This analysis implied a range of values for the Company common stock of approximately $15.23 to $19.96 per share. Qatalyst Partners noted that the implied value of the consideration to be received by holders of Company common stock pursuant to the Merger Agreement was $15.53 per share, based on Cavium's closing stock price on June 14, 2016.

No company or transaction utilized in the selected transactions analysis is identical to the Company or the Transactions. In evaluating

the selected transactions, Qatalyst Partners made judgments and assumptions with regard to general business, market and financial conditions and other matters, many of which are beyond the control of the Company, such as the impact of competition on the business of the Company or the industry generally, industry growth and the absence of any material adverse change in the financial condition of the Company or the industry or in the financial markets in general, which could affect the public trading value of the companies and the aggregate value of the transactions to which they are being compared. Because of the unique circumstances of each of these transactions and the Transactions, Qatalyst Partners cautioned against placing undue reliance on this information.

83.   The Recommendation Statement is false or misleading due to the omissions identified above.   Without such undisclosed information, QLogic stockholders cannot evaluate for themselves whether the financial analyses performed by Qatalyst were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction.  In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Qatalyst's opinions and analyses should factor into their decision to tender their shares.

*Material Omissions Concerning the Background to the Proposed Transaction*

84.    The   Recommendation   Statement   also   fails   to   disclose   material information relating to, among other things, the background of the Proposed Transaction, including:

(a)    The strategic opportunities, components of the Company's stand-alone operating model and possible acquisition opportunities considered by the Board as an alternative to a sale of the Company;

(b)    The reasons why the Board allowed defendant King to negotiate on behalf of the Company despite being conflicted due to the benefits she stood to receive from the Proposed Transaction and the offer of a board seat in the combined company from Cavium;

(c)    Why the Board did not seek to extract a higher offer from Party C, before entering into exclusivity with Cavium; and

(d)    Whether any of the parties who executed confidentiality agreements that contain standstill provisions have requested a waiver from the Company, and if so, whether these parties have been released from the standstill provisions in order to make a topping bid for the Company.

85.    Defendants' failure to provide QLogic stockholders with the foregoing material information renders the statements in the "Background of the Merger" and "Reasons for the Merger and Recommendation of the Board of Directors" sections of the Recommendation Statement false and/or materially misleading and constitutes a

violation of §§ 14(d)(4), 14(e) and 20(a) of the Exchange Act. The Individual Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Recommendation Statement. Absent disclosure of the foregoing material information prior to the expiration of the tender offer, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to tender their shares in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## CLAIMS FOR RELIEF

## COUNT I

### Class Claims Against All Defendants for Violations of § 14(e) of the Exchange Act

86.    Plaintiffs repeat all previous allegations as if set forth in full.

87.    Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. § 78n(e).

88.    As discussed above, QLogic filed and delivered the Recommendation Statement to its stockholders, which defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above.

89.     Defendants violated § 14(e) of the Exchange Act by issuing the Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or engaged in deceptive or manipulative acts or practices, in connection with the tender offer commenced in conjunction with the Proposed Transaction.   Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.     The Recommendation Statement was prepared, reviewed and/or disseminated by defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the tender offer, the intrinsic value of the Company, and potential conflicts of interest faced by certain Individual Defendants.

91.     In so doing, defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of § 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the Recommendation Statement, defendants were aware of this information and their obligation to disclose this information in the Recommendation Statement.

92.     The omissions and incomplete and misleading statements in the Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the Recommendation Statement as altering the "total mix" of information made available to stockholders.

93.     Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

94.     The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

///

///

# COUNT II

## Class Claims Against All Defendants for

## Violations of § 14(d)(4) of the Exchange Act and

## SEC Rule 14d-9 (17 C.F.R. § 240.14d-9)

95.     Plaintiff repeats all previous allegations as if set forth in full.

96.     Defendants have caused the Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

97.     Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, § 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

98.     SEC Rule 14d-9(d), which was adopted to implement § 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 (§ 240.14d-101) or a fair and adequate summary thereof.

99.     In accordance with Rule 14d-9, Item 8 of a Schedule 14D-9 requires a Company's directors to:

Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

100.   The Recommendation Statement violates § 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, which omissions render the Recommendation Statement false and/or misleading.

101.   Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the Recommendation Statement, rendering certain portions of the Recommendation Statement materially incomplete and therefore misleading.

102.   The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the tender offer.

## COUNT III

### Class Claims Against the Individual Defendants for

### Violation of § 20(a) of the Exchange Act

103.   Plaintiff repeats all previous allegations as if set forth in full.

104.   The Individual Defendants acted as controlling persons of QLogic within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers or directors of QLogic and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

105.   Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of this document.

107.   In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction.   The Recommendation Statement purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

108.   By virtue of the foregoing, the Individual Defendants have violated § 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor on behalf of QLogic, and against defendants, as follows:

A.   Ordering that this action may be maintained as a class action as to the counts asserted on behalf of Plaintiff and the Class, and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.   Declaring that all defendants violated § 14(e) of the Exchange Act;

C.   Declaring that all defendants violated § 14(d)(4) of the Exchange Act and SEC Rule 14(d)(9);

D.   Declaring that the Individual Defendants violated § 20(a) of the Exchange Act;

E.      Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

F.      In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding compensatory damages and rescissory damages to Plaintiff and the Class;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable allowance for Plaintiff's attorneys' fees, expenses and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated: July 22, 2016                  **WEISSLAW LLP**
                                      Leigh A. Parker


                                      By: _s/ Leigh A. Parker_
                                          Leigh A. Parker
                                      1516 South Bundy Drive, Suite 309
                                      Los Angeles, CA 90025
                                      Telephone:  310/208-2800
                                      Facsimile:  310/209-2348
                                                -and-
                                      Richard A. Acocelli
                                      1500 Broadway, 16th Floor
                                      New York, NY  10036
                                      Telephone: 212/682-3025
                                      Facsimile:  212/682-3010

                                      *Attorneys for Plaintiff and*
                                      *the Proposed Class*

## <u>CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS</u>

The undersigned certifies as follows:

1.    The undersigned has reviewed the complaint in this matter against QLogic Corporation ("QLogic") and others and would authorize the filing thereof, if necessary.

2.    The undersigned did not purchase the security that is the subject of this action at the direction of counsel or in order to participate in this lawsuit.

3.    The undersigned is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.    The undersigned has been, at all relevant times stated in the complaint the holder of 100 shares of QLogic common stock.

5.    The undersigned has not sought to serve or served as a class representative under the federal securities laws in the last three years, other than as listed below:

*In re PVR L.P. Securities Litigation*, Civil Action No. 2:13-cv-06829-HB (E.D.P.A.)

*In re QR Energy LP Unitholder Litigation*, Lead Case No. 4:14-cv-02195 (S.D.T.X.)

6.    The undersigned will not accept any payment for serving as a representative party beyond the undersigned's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

DATED:    July 21, 2016

*stephen bushansky*
stephen bushansky (Jul 21, 2016)
_____
Stephen Bushansky